**TRINGALI BROTHERS,**
Plaintiff–Appellee,

v.

**UNITED STATES of America,**
Defendant–Appellant.

No. 78–3831.

United States Court of Appeals,
Fifth Circuit.
Unit A

Nov. 19, 1980.

James A. Lewis, Admiralty & Shipping Sec., Dept. of Justice, Washington, D. C., for defendant–appellant.

Liskow & Lewis, S. Gene Fendler, Donald R. Abaunza, New Orleans, La., for plaintiff–appellee.

Before COLEMAN, Chief Judge, RUBIN and WILLIAMS, Circuit Judges.

COLEMAN, Chief Judge.

The issue in this case, vigorously contested by the government, is whether it is liable in damages for 20% of what happened when the Coast Guard left a buoy out of place and the skipper of the M/V ATLANTIC BREEZE ran his vessel into a jetty in the Calcasieu Channel, outside Cameron, Louisiana.

The District Court found both parties negligent and apportioned fault at 80% against the vessel owners and 20% against the United States. The government appeals. We affirm.

The United States Coast Guard maintains several systems to warn of hidden dangers to those who navigate along the Gulf Coast. This includes lighted buoys, unlighted buoys, bell buoys, range lights, and a radio beacon system.

Jurisdiction is grounded on the Admiralty Jurisdiction Act, 46 U.S.C. § 740,[1] and the Federal Tort Claims Act, 28 U.S.C. § 2674, et seq.[2]

The Coast Guard has no statutory *duty* to place navigational aids in hazardous waterways but it is *authorized* to do so by 14 U.S.C. § 81[3] and 14 U.S.C. § 83,[4] which specify that the Guard has sole authority to perform this function. Once the Coast Guard sets out buoys as navigational aids, it is bound to maintain them in a reasonable and prudent manner. Failure to exercise due care in buoy maintenance gives rise to an action in negligence against the government under the Federal Torts Claim Act. *Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48 (1955). If it is determined that negligence by the Coast Guard was a proximate cause of an injury to the plaintiff, the court must apportion damages based upon its assessment of comparative fault between the parties. *United States v. Reliable Transfer*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

1. § 740. *Extension of admiralty and maritime jurisdiction; libel in rem or in personam; exclusive remedy; waiting period*
   The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

2. § 2674. *Liability of United States*
   The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances. . . .

3. § 81. *Aids to navigation authorized*
   In order to aid navigation and to prevent disasters, collisions, and wrecks of vessels and aircraft, the Coast Guard may establish, maintain, and operate:
   (1) aids to maritime navigation required to serve the needs of the armed forces or of the commerce of the United States;
   (2) aids to air navigation required to serve the needs of the armed forces of the United States peculiar to warfare and primarily of military concern as determined by the Secretary of Defense or the Secretary of any department within the Department of Defense and as required by any of those officials; and
   (3) electronic aids to navigation systems (a) required to serve the needs of the armed forces of the United States peculiar to warfare and primarily of military concern as determined by the Secretary of Defense or any department within the Department of Defense; or (b) required to serve the needs of the maritime commerce of the United States; or (c) required to serve the needs of the air commerce of the United States as requested by the Administrator of the Federal Aviation Administration.

4. § 83. *Unauthorized aids to maritime navigation; penalty*
   No person, or public body, or instrumentality, excluding the armed services, shall establish, erect, or maintain any aid to maritime navigation in or adjacent to the waters subject to the jurisdiction of the United States, its territories or possessions, or the Trust Territory of the Pacific Islands, or on the high seas if that person, or public body, or instrumentality is subject to the jurisdiction of the United States, without first obtaining authority to do so from the Coast Guard in accordance with applicable regulations. Whoever violates the provisions of this section or any of the regulations issued by the Secretary in accordance herewith shall be guilty of a misdemeanor and shall be fined not more than $100 for each offense. Each day during which such violation continues shall be considered as a new offense.

At its entrance, the Calcasieu Channel has parallel stone jetties which pose a danger at night or at times when the tide is more than three feet. Accordingly, the Coast Guard set up two buoys: (1) # 45, a lighted, black buoy on the western side of the channel and (2) # 46, a lighted, red bell buoy on the eastern side of the channel. When both are correctly in place, the navigator, of course, can steer between the two, avoiding the jetties.

Each buoy is anchored by a 90–foot chain, tied to a 5–ton sinker. The buoy can swing on its chain beyond the point of anchor in a radius of at least 60–70 feet. This swing is calculated in the positioning of the buoy so that it can make the swing and still be in an adequate warning position. Weather conditions, waves, and other factors ultimately cause the buoys to move off correct position. To one depending upon the buoys, such shifts can have disastrous consequences, steering him into, rather than away from, dangerous obstructions. The Coast Guard is well aware of the tendency to move from the intended locations (it refers to such wandering as "discrepancies").

In the Gulf Coast area the Guard has two systems for the correction of such discrepancies. Its primary means of *maintenance* is its buoy tender, CGC GENTIAN, a 180–foot vessel carrying specialized equipment, including a crane to handle and reset buoys. In 1975 the CGC GENTIAN was the only buoy tender assigned to the Gulf of Mexico. If the CGC GENTIAN is not available, the Coast Guard has smaller utility boats which periodically check buoy positions. In the Calcasieu Channel area these boats are operated by the Coast Guard "Aids to Navigation Team" at Sabine, Texas (hereafter referred to as "A. N. T. Sabine"). The record reflects some dispute as to the actual capabilities of these small boats operated by A. N. T. Sabine beyond observation and fact finding.

The CGC GENTIAN requires periodic maintenance and repair ("Charlie status") scheduled months in advance. The CGC GENTIAN was scheduled to go on two weeks of "Charlie status" beginning September 7, 1975. On September 4, 1975, buoys 45 and 46 were checked and found in place, functioning correctly. On September 7 the Coast Guard vessel went into Charlie status, as scheduled. Two weeks later the commander of the CGC GENTIAN applied for and received a two day extension of the maintenance period, to September 23, 1975. No explanation has been offered for this extension. From September 7 to September 23 the CGC GENTIAN received messages of discrepancies and referred them to A. N. T. Sabine.

Four days before this maintenance period ended, a report of a discrepancy as to Buoys 45 and 46 came in, September 19, 1975. These discrepancies are described in Sabine group broadcast reports every 6 hours on VHF radio. For aught that appears in this record, from September 19 to September 24, the Guard broadcast that Buoy 45 was off position.[5]

On September 20, 1975, A. N. T. Sabine sent out a 40 foot utility boat to investigate discrepancies. It found that Buoy 45 was 40 yards off charted position, but Buoy 46 was in place. The utility boat made no attempt either to "steam" (drag) Buoy 45 back into position or to substitute for it a smaller "temporary replacement unlighted buoy" (referred to as a "TRUB"). The only action was to note the discrepancy for broadcast and wait for the CGC GENTIAN to come off Charlie status and correct the discrepancy.

In oral argument, the government contended that a 40–foot utility boat is too small to pull a 12–foot flashing buoy weighing 7 tons and attached to a 5–ton sinker (the dimensions of Buoys 45 and 46). It also asserted that it is equally impractical to expect the smaller boat, which has no

---

5. The record does not show affirmatively that the discrepancy on Buoy 45 was actually broadcast. The United States introduced evidence of its practice of broadcasting reports of discrepancies and argues that there is no reason to doubt the discrepancy on Buoy 45 was broadcast. Tringali Brothers does not contest this.

crane on board, to handle a TRUB. It argues that even if the A. N. T. Sabine personnel had managed to get the 600 pound TRUB with its 1000 pound sinker on the utility boat it would have been difficult, not to mention unreasonably dangerous, to expect it thereafter to be thrown overboard at the correct location. The Coast Guard says the dangers of either maneuver were increased by the presence of 5–7 foot waves in the Calcasieu Channel on September 20, 1975.

The evidence on wave elevation when the Coast Guard found the discrepancy in Buoy 45 is conflicting. The District Court discounted the 5–7 foot estimate and accepted the weather reports from the National Climatic Center in Sabine, Texas and Lake Charles, Louisiana which stated waves were actually 0–2 feet that day. Based upon this, and the testimony of Commander Rex Morgan of the Coast Guard, the Court also discounted the assertion that it was impossible under any conditions for a utility boat to drag a buoy like No. 45 back into position.[6]

In any event, the stage was set for that which soon followed.

On September 21, 1975, three shrimp trawlers, belonging to Tringali Brothers, left Galveston heading for Fernandino Beach, Florida. The lead boat was the M/V ATLANTIC BREEZE, piloted by Captain Clarence Williams. Following were the M/V ATLANTIC MOON and the M/V ATLANTIC STAR. On the morning of their departure there were weather warnings of a hurricane in the Gulf of Mexico. By the evening the weather had worsened, so Captain Williams decided to pull into Cameron, Louisiana, to sit out the storm. To do this the flotilla had to pass through the Calcasieu Channel, eluding the stone jetties.

Captain Williams testified that he was relying almost exclusively upon the Coast Guard buoys, travelling by sight from buoy to buoy. He says that he could not find Buoy 46 (concluding its lights were out), and therefore had to rely strictly upon Buoy 45. Depending upon Buoy 45, he piled into the jetty, damaging the wooden hull of the ship and causing further economic damages to Tringali Brothers. After the collision he warned the boats following and they escaped harm. Three days later, when the CGC GENTIAN got off Charlie status and came to check on Buoy 45, it was 110 yards off station.

The District Court found that responsibility for this collision rested heavily on the shoulders of Captain Williams of the M/V ATLANTIC BREEZE. The Court found it highly imprudent for the Captain to enter the Calcasieu Channel without charts and with only a sketchy knowledge of the channel obtained three years earlier by having navigated it during the daytime. It found the Captain violated the statutory duty set out in 33 U.S.C. § 221[7] by not having a proper lookout. It discounted the major part of the Captain's testimony, including his claims that Buoy 46 was not lighted and that the Coast Guard's range lights were not usable. It found the Captain negligent in failing to use his compass or loran, and relying too heavily on buoys for navigational assistance. Prudent navigators, the Court said, are well aware that buoys shift in position and so they utilize other means of navigation. The Captain was faulted for using his spotlight too sparingly, for using his CB radio only to communicate to other

---

6. When assuming that waves were 5–7 feet high, both Morgan, who is Chief of the Coast Guard's Aids to Navigation Branch of the 8th District, and Lt. Commander Lawrence J. Murphy, Jr., in charge of the CGC GENTIAN in 1975, stated that the utility boat could not have steamed Buoy 45 back into place. When asked to assume that waves were 0–2 feet, both conceded the utility boat might have been able to move the buoy. Commander Morgan stated that visibility would have to be good for the utility boat to steam the buoy.

7. § 221. *Usual additional precautions required generally (article 29)*

Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case.

ships in his caravan, and for not using his VHF radio, or seeking assistance from the Coast Guard at Monkey Island. Had Captain Williams used his VHF radio he might have learned that Buoy 45 was off station and perhaps would have sought the assistance which could have helped elude the west jetty.

Despite this heavy criticism of the failures of Captain Williams, the Court did not find that his negligence was the sole proximate cause of the accident. It also found that the Coast Guard actions of September 1975 deviated sufficiently from the requirements of due care to justify assessing it with 20% of the blame for the accident.

In evaluating the Government's liability, the Court took note of the Coast Guard Aids to Navigation Manual, Coast Guard Publication 222.1, an internal manual written for the benefit of employees of this agency. This manual has three provisions particularly applicable to the Coast Guard's handling of the discrepancy of Buoy 45, September 19–24, 1975. Referring to the temporary resolution of a discrepancy the manual states in Section A–1D, titled *Use of Smaller Units and Discrepancy Buoys*, subsection 2, that

> For most discrepancies pertaining to missing, off station, damaged or destroyed aids, a discrepancy buoy used in conjunction with adequate mariner notification can temporarily replace an aid until the aid can be replaced, relieved or rebuilt.

Subsection 1.b of Section A–3C, titled *Priority Discrepancy Response* gives guidelines for responding to a discrepancy such as that in Buoy 45. It states:

> 1. Discrepancies which fall under one or more of the following descriptions will be corrected in *24 hours.*
> b. The discrepancy not only conflicts with the aids advertised characteristic or position but *may also mislead mariner.*

[Emphasis added.]

These guidelines recognize some reasons for a delayed response to discrepancies and have some built–in flexibility. Section A–

1G, titled *Delay in Correcting Discrepancies* states:

> Appropriate corrective action shall be taken within the time periods corresponding to the discrepancy response levels promulgated in Section A–3. If weather or other conditions create excessive risks to servicing personnel, corrective action shall be postponed until conditions improve. Delay in the correction of discrepancies beyond the time established in Section A–3 should be reported to the command dispatching the servicing unit indicating the reason for the delay and when restoration may be expected.

The government strenuously objects to the Court's use of the Aids to Navigation Manual as evidence of negligence. It argues (correctly) that this manual does not have the force of law and further argues that therefore it does not create any duty of the government toward private citizens, the breach of which would be grounds for recovery in tort, citing *Thompson v. United States*, 592 F.2d 1104, 1109–1110 (9th Cir. 1979); *Home Shipping Co., S. A. v. United States*, 239 F.Supp. 226 (D.Del.1965), *aff'd per curiam and reh'g denied*, 359 F.2d 435 (3rd Cir. 1966), *cert. denied*, 385 U.S. 930, 87 S.Ct. 289, 17 L.Ed.2d 212 (1966).

If the District Court had determined that the violation of the internal manual amounted to negligence *per se* and that this automatically entitled Tringali Brothers to recovery in tort, that would have been wrong as a matter of law, necessitating reversal. But this is not what the District Court did.

■ The Court determined that in the totality of its handling of the discrepancies the Coast Guard failed to exercise due care in the maintenance of Buoy 45 in its correct location. That the Coast Guard failed to live up to its internal guidelines was not conclusive but the Court was entitled to consider it along with all other evidence in the case.

■ The District Court found that the Aids to Navigation Manual and Coast Guard practices strongly suggested alterna-

tive responses to the discrepancy which the Guard found in Buoy 45, on September 20, which were either dragging the buoy back into place or placing a TRUB in place. The Coast Guard utility boat did neither and only gave radio warnings, an inadequate response. *Greer v. United States*, 505 F.2d 90 (5th Cir. 1974).

The government argues that the utility boat could not drag Buoy 45 back into place or place a TRUB into position. Its position is that in the light of 5–7 foot waves on September 20, A. N. T. Sabine did all it could to exercise due care when it discovered the discrepancy and broadcast news about it on the radio. This argument has to fail because the District Court found that waves were actually 0–2 feet and that the utility boat might have been able to drag Buoy 45 back into place, findings which are not clearly erroneous. Rule 52(a), Fed.R. Civ.Proc.

If we assume, *arguendo*, that the Coast Guard utility boat lacked the capability either of dragging Buoy 45 back into position or of placing a TRUB into position, that does not end the matter. The District Court further found the timing of the CGC GENTIAN's Charlie period particularly negligent because it occurred during hurricane season in the Gulf of Mexico, when weather conditions were most likely to drive buoys off course.

The government argues that the District Court made no finding of causation here as required by *Inter–Cities Navigation v. United States*, 608 F.2d 1079 (5th Cir. 1979). Because the District Court severely castigated Captain Williams as an imprudent navigator, the government argues there is no evidence that the substitution of a small unlighted buoy (the TRUB) would have prevented this accident. This argument mistakenly assumes that the finding of negligence was based solely on A. N. T. Sabine's failure to set out a TRUB when it discovered the discrepancy in Buoy 45. Had the Coast Guard not taken the CGC GENTIAN out of service during the hurricane season, had it retained the capability of responding to discrepancies in an effective manner

when the CGC GENTIAN was voluntarily pulled from service, or, alternatively, had it at least attempted to steam Buoy 45 back into place or set out a TRUB when it found Buoy 45 so far off its correct location the government would have been in a more tenable position.

On the facts, as recited, this Court is left in no position to substitute findings urged by the government for those of the District Court.

The judgment of the District Court, assessing the Coast Guard with 20% of the fault for this occurrence is

AFFIRMED.