Wayne E. **KUROWSKY**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

No. 83 Civ. 2371 (PKL).

United States District Court,
S.D. New York.

Nov. 12, 1986.

Findings of Fact and Conclusions
of Law on Damages May 15, 1987.

Haight, Gardner, Poor & Havens, New York City (Stephen K. Carr, of counsel), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., New York City (Marie L. Hagen, of counsel), for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEISURE, District Judge:

This is an action for damages arising out of plaintiff's efforts to assist a third party in recovering a sailboat. A non-jury trial on liability began on November 3 and ended November 10, 1986. Having heard the oral evidence offered at trial, and having considered the exhibits in evidence and briefs of counsel, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. At 1:24 a.m. on January 24, 1982, Ronald Grant called the United States Coast Guard, Group New York, at Governor's Island (hereinafter "CGNY"). He told CGNY that his sailboat had drifted from its mooring at Raritan Yacht Club.

He had first called Coast Guard Group Sandy Hook (hereinafter "Sandy Hook") in New Jersey, but was advised to contact CGNY because Sandy Hook was iced in and had no boats in the water. Petty Officer Cox stated, "Okay, sir, we'll see what we can do for you, okay?" Cox took the telephone number of the Raritan Yacht Club, where Grant had been using a phone, as well as Grant's home number.

2. Grant's vessel was a 27–foot, white, one-design, sloop Soling sailboat.

3. At 9:57 a.m., George Merz, a waterfront resident of Joline Lane on Staten Island, contacted CGNY and informed Operations Duty Officer Detwiller that a boat was adrift in the tanker channel north of Boundary Beacon at the western end of Raritan Bay. Merz stated that the sailboat was sitting more or less stationary about 100 to 150 yard offshore, and that it probably came from the Raritan Yacht Club. Detwiller said that CGNY had already received a report that a sailboat was adrift from the yacht club.

4. At 10:07 a.m., Mr. Kaladsky, a neighbor of Merz on Joline Lane, reported to Detwiller that a sailboat was "parked" almost in the channel in Raritan Bay and there was nobody on it. Detwiller stated that he had already received such a report and that "I'm trying to get somebody to take care of it now."

5. At 10:15 a.m., Detwiller called Grant's home and spoke to his wife. Detwiller stated that the sailboat had been spotted, and gave Mrs. Grant the telephone numbers of Merz and Kaladsky, so that she could receive a more precise report of the boat's location from them. Detwiller stated that "if you request further Coast Guard assistance, please let us know. We have no boats in the area right now, and it'll take us quite a while to get a boat there." He added that the boat "is in the channel and it could be damaged by barges transiting the area." He concluded, "So the sooner you get somebody there, the better."

6. At all times referred to herein, the Coast Guard Cutter LINE (the "LINE") was under the command of Chief Boatswain Mate Aldridge L. Lees, Jr. Chief Lees joined the Coast Guard in September, 1963. From September, 1963 through May, 1964, he served on active duty as a radarman. In May, 1964, Lees was released from active duty. He served in the Coast Guard reserves from that time until his enlistment expired in 1969. Lees reenlisted in April, 1980, when he went into active duty as a first class boatswain mate. He was transferred in June, 1981 to CGNY and the LINE, where he became officer in charge. Prior to January 24, 1982, Lees had reviewed the Coast Guard's National Search and Rescue Manual and was aware of the Coast Guard's internal policy on towing and salvage.

7. The LINE is a 65 foot tugboat. Its draft forward is four-and-one half feet and its draft aft is six-and-one half feet. The LINE has a maximum speed of ten knots. It carries towing gear and boat hooks, a reinforced bow for ice-breaking, a bull horn, fathometer, loud hailer, and television, among other equipment.

8. On January, 24, 1982, the crew aboard the LINE consisted of Lees and five other individuals.

9. The LINE had had engine trouble early in the day, and had made an engineering run to check out the engine repairs. As the engine repairs had been successful, the LINE had been directed to check on the aids to navigation in Raritan Bay. The Coast Guard had received several reports that buoys in the area were missing. The LINE headed to the Ward's Point area of Raritan Bay along the east side of Staten Island, passing under the Verrazano Bridge.

10. At 2:42 p.m., Grant called CGNY and spoke to QM3 Moochler. Grant said he had located his boat off Staten Island, near Prince's Bay, sitting in the channel, but that, "I can't locate any way of getting out to it." Moochler responded, "I'm afraid you're going to have to get commercial assistance for that." Grant stated that due to icy conditions "[n]obody's in the water now." Moochler explained that the Coast Guard did not send out its boats in icy conditions unless there was a "distress sit-

uation." Grant said there was "no distress at this time," and Moochler reaffirmed that "we wouldn't, you know, respond to anything like this." Grant asked Moochler for suggestions. Moochler suggested that Grant contact private marinas, launches, or tug boat companies in the area.

During the time of this conversation with Grant, CGNY spoke by radio with the LINE, and was informed that the LINE was en route to Ward's Point. CGNY told the LINE that it had a report of a sailboat adrift in the channel by Prince's Bay. CGNY asked the LINE to investigate.

CGNY told Grant, "Okay, we got a tug boat that's heading down that area right now." Grant then tried to explain more precisely where the boat was currently located. He added that it was dragging anchor.

CGNY asked Grant to hold, and CGNY then spoke to the LINE again. The LINE stated, "By the time we get down there it's probably going to be down there in that shoal area, see that?" CGNY responded to use caution and asked the LINE to let it know if the LINE could be of assistance.

Again speaking to Grant, CGNY confirmed that a Coast Guard vessel was en route to the scene. CGNY added, "[B]ut it's possible that she won't be able to get in close enough to assist because of the shoals in the area." CGNY advised that "when she gets on scene she'll notify us of the condition."

11. At 2:59 p.m., Grant spoke to CGNY again. Detwiller told Grant that a Coast Guard vessel was en route "and when they call in and let us know what the status is around your vessel I'll get in contact with you again." Grant asked whether he should wait at the yacht club, where he had been using a pay phone. Detwiller responded, "Yeah, that's the only thing I can suggest at this time, unless you can get a boat from the yacht harbor to take you over there." He added that the Coast Guard vessel would not be on the scene for another hour or so. Grant said he would try to get commercial assistance. Grant explained, "I'll try, if I can get some commercial way over, I'll call you back and tell

you thank you and, you know, to forget it, okay?" Grant said he would try Stapleton Launch. Detwiller responded, "Okay, and like I say, once our vessel gets down there and is able to appraise the situation, we can give you a better idea of what we can do for you." After Grant asked another question, Detwiller responded, "Like I say, let's, let's just wait until he gets there and we'll contact you." Grant said, "Okay."

12. At 3:06 p.m., CGNY broadcast an announcement that Raritan Bay channels would be closed to all vessels during hours of darkness because aids to navigation were missing or off station due to ice.

13. At 3:10 p.m., the LINE contacted CGNY and asked whether "it's prudent for us to continue." The LINE said it had heard the broadcast about the channel closing, and added that it was experiencing three to four foot seas, was icing up, and had been forced to cut its speed. CGNY asked how close the LINE was to the vicinity where the sailboat had been reported adrift.

14. A few minutes later, at 3:13 p.m., the LINE said it would take about an hour to get to the vicinity of the sailboat. After discussing safety conditions, the LINE said it would continue toward Old Orchard Light and evaluate conditions at that point. CGNY advised the LINE to "give us a call from there."

15. At 3:32 p.m., the LINE contacted CGNY after turning across Raritan Bay. The LINE stated, "It doesn't appear to us in the conditions we're encountering here that we would be able to go down and attempt to retrieve that sailboat. Conditions are just marginal for us right here now; we're going to try to work into the lee and come back up the kills, over." CGNY acknowledged receiving this transmission.

16. At 3:54 p.m., CGNY asked the LINE whether it was in sight of the sailboat. The LINE said it had been keeping an eye out for the sailboat, but had been unable to spot it. The LINE added, "Right now we're just concerned with getting ourselves back in the lee, because all

this ice we've taken on board, we got some pretty good swells down here." After further conversation, CGNY advised the LINE that it had permission to return to Governor's Island when feasible. The LINE estimated it would take about two to two-and-one half hours to get back.

17. On Sunday, January 24, 1982, plaintiff Wayne Kurowsky was scheduled to work the day shift from 7:30 a.m. to 7:30 p.m. as a boat operator at Amerada Hess' First Reserve Terminal located on the Raritan River in Perth Amboy, adjacent to the Victory Bridge on the north bank of the river. His duties required him to place flotation booms around vessels loading and discharging petroleum products at the Hess facility. In order to position the booms, Kurowsky used a 19-foot MAKO work boat (the "MAKO") equipped with a 75 horsepower outboard motor, life jackets, a life ring, spot light, running lights, and a hand-held radio but no flares.

18. Grant contacted various commercial operators in the area, and someone with whom he spoke told him that Hess had boats, so Grant went to the Hess facility. He arrived at about 4:30 p.m., shortly before the Super Bowl football championship was scheduled to begin. Grant asked the two men at the Hess office, one of whom was the plaintiff, if they could take him out to get his sailboat. Although Hess did have the MAKO work boat in the water, no one there wanted to assist Grant.

At 4:32 p.m., Grant called CGNY from the Hess facility and spoke with Moochler. Moochler began by advising Grant, "We're not going to be able to, our tug's not going to be able to get in there, and so they're going to return; we're not going to be able to help you out in that situation." Grant told Moochler that he was calling from the Hess facility. Grant said that Hess had "a boat that could go, go out, and pull her over to the tug or whatever."

During the time of this conversation with Grant, at 4:33 p.m., the LINE contacted CGNY. The LINE reported that it was in the vicinity of Ward's Point Bend light number 52, about one-and-one half miles north of Boundary Light, and had spotted a

sailboat. CGNY asked the LINE whether it was able to get near the sailboat. The LINE responded in the affirmative, and asked CGNY to confirm that the sailboat it had sighted was the same one that had been the subject of the earlier reports. CGNY responded that it had the owner on the phone, and asked the LINE to stand by.

Again speaking to Grant, Moochler said that "our boat can see your boat right now I believe." He added, "I don't know, I don't know what they can do for you, though. I really don't know, we'll just have to work something out here." Moochler asked whether Hess had a boat that could be of assistance. Grant responded in the affirmative. Moochler asked, "Well, can they, can they bring you out to it?" Moochler explained, "[O]ur tug boat's getting really iced up, you know, I don't want to keep them out there any longer than they have to; I want to get them back here." Moochler asked again, "Can you ask these guys if they can, you know, take you out there to your boat?" Grant said yes, and added, "Okay, I'll get back in touch then." There was no further communication between Grant and CGNY.

19. Grant informed Kurowsky and the other man that a Coast Guard vessel was on its way to the scene. This news prompted a change in the attitude of the Hess men. One of the Hess workers called a supervisor at another terminal to obtain permission to take Grant out to his sailboat in the Hess workboat. Permission was granted.

20. At 4:36 p.m., CGNY contacted the LINE. CGNY stated, "I believe the owner might have somebody that can bring him out in a different boat." CGNY added that it would keep the LINE informed of the situation. CGNY asked the LINE whether it would be able to get to the sailboat. The LINE answered that the sailboat was in eight or nine feet of water, and with the incoming tide "we can probably get in there." CGNY asked the LINE to stand by for a few minutes.

21. At 4:44 p.m., CGNY told the LINE, "See if you can take that thing in tow, if you can get to it, and head up the kills and

find any spot to drop it off and call us back and let us know where you dropped it off and I can let the owner know where it's at." The LINE acknowledged receiving this message.

22. At 4:48 p.m., Moochler advised Detwiller that "the LINE's going to take that, get that boat in tow, just drop it off somewhere in the kills; I'm going to tell the owner when he calls back where it's at." Detwiller asked whether the LINE had the sailboat in tow already. Moochler responded that "[t]hey're doing that right now." After further conversation, Detwiller asked Moochler, "what did you do, call the yacht club and the guy's not there?" Moochler responded, "No, he called, and he, they might have another boat to pick, to pick it up themselves; I'm not going to wait around any more cause the LINE can get to it and they're there." Detwiller answered, "Okay, if they can get to it and they're there, you might as well...."

23. By this time, the Super Bowl game was in progress.

24. At 4:50 p.m., CGNY contacted the LINE to suggest that the Raritan Yacht Club would be the best place to drop off the sailboat. The LINE responded that "the biggest problem is going to be getting somebody on board there to handle the lines and all; that's what we're trying to do." CGNY responded that the LINE should "just keep us informed; if you can't do it, don't risk anything...." The LINE added that "we only got a few more minutes left to work here cause the sun's going to go down pretty soon."

25. When Chief Lees prepared to tow the sailboat, he noted that the sailboat had freeboard (area above the water) of one to two feet. The LINE's freeboard was five feet. In order to take the sailboat in tow, a member of the LINE's crew would have to go on board the sailboat to secure the tow line and release the anchor line. Lees became concerned about the danger that a member of his crew would risk in boarding the sailboat and in manipulating the tow and anchor lines. After making three passes at the sailboat Lees decided to secure from any attempt to tow. That the LINE had attempted to tow the sailboat and thereafter abandoned any such attempt was not known to Grant and Kurowsky.

26. At approximately 4:40 p.m., or shortly thereafter, Kurowsky and Grant had left the Hess terminal, boarded the work boat, and proceeded out the Raritan River beyond the Railroad Bridge. It was not until that point that Kurowsky first learned that the sailboat was not a short distance beyond the Railroad Bridge, just south of Perth Amboy, but was in fact near the Staten Island shore. Kurowsky told Grant that he wanted to turn around, but Grant then pointed out that a Coast Guard cutter was over in the area. Encouraged by this observation, Kurowsky steered the MAKO out across the entrance to the bay to the Staten Island side. The men headed directly for the LINE, which was in the vicinity of Light 58 off the southwest corner of Staten Island, known as Ward's Point.

27. At 4:53 p.m., the LINE reported to CGNY that "we've decided to secure from any attempt to take this vessel in tow." The LINE explained that it was experiencing 45 knots of wind and about a two foot chop, and there were only about ten more minutes of daylight. The LINE added that the sailboat "is anchored at the present time, it's just, it doesn't appear to us like it's dragged very much ever since we came on scene, so we think the safest thing to do is to secure...." The LINE concluded that due to current conditions, "we'd just end up injuring the [sailboat] or one of our personnel."

CGNY responded by agreeing that there was "no sense getting anybody hurt with something like this." CGNY added, "We'll notify the owner exactly where the vessel is anchored and advise him that due to the weather conditions in our judgment, if we try to do anything with this right now, not only would we run the risk of damaging his boat, but we'd probably get one of your guys banged up...." CGNY then advised the LINE that its best return route was through the kills where weather conditions would be less severe. The LINE agreed.

CGNY stated, "[L]ike I say, Chief, we'll get a hold of the owner and tell him where this thing is anchored, and due to the wind and sea conditions, it would be not only impossible, but dangerous both for his boat and for our personnel to try to do anything with it right now, as long as she's anchored, that's probably the best bet, and she isn't going to drag." The LINE responded that the sailboat did have its anchor out and appeared to be secure "for the time being, particularly with this channel closed and no vessels making transit, there'd be no danger to the vessel itself." CGNY answered that "we'll tell the owner that first thing in the morning maybe he can try to get some way of getting out there and get the boat himself."

28. Upon approaching the LINE in the MAKO, Kurowsky crossed the bow of the cutter, which was headed north, and brought his boat around parallel to the cutter, heading north, with his port side a short distance away from the starboard side of the LINE's wheelhouse. A conversation took place. Weather conditions made communication difficult but not impossible. Chief Lees did not use a bull horn or loud hailer. Lees, who was standing in the wheelhouse of the LINE, shouted to Grant and Kurowsky that the sailboat was at Light 52 and that the Coast Guard could not get it because there was not enough water. Kurowsky then yelled to the LINE that he would get the sailboat and bring it back to the cutter so that the LINE could tow the sailboat back. Lees indicated his agreement by gestures of his hands and head.

29. Lees' actions encouraged Grant and Kurowsky to continue their attempt to retrieve the sailboat.

30. During or shortly after the encounter with Grant and Kurowsky, the LINE touched bottom on a shoal. It was now about 5:00 p.m. Kurowsky and Grant proceeded in the MAKO toward the sailboat, which was in the vicinity of Light 52, about six-tenths of one mile to the southeast. Lees watched where the men in the MAKO were headed for a short moment, and then stopped observing them.

31. When Kurowsky and Grant arrived at the sailboat, Kurowsky pulled alongside and Grant stepped into the sailboat. Plaintiff handed Grant a tow line, which was dropped into the water. The tow line became tangled in the MAKO's propeller, causing the MAKO to lose both power and steerage. Kurowsky pulled the outboard engine out of the water and attempted to cut the tow line off his propeller. While so doing, the wind blew the MAKO around and a wave washed over its stern, filling the MAKO with water. Aboard the sailboat, Grant saw the MAKO in trouble. Grant saw Kurowsky waving and shouting at the LINE. Grant cut the sailboat loose from its anchor and guided it under a bare pole down towards the MAKO. Kurowsky climbed aboard the sailboat. Kurowsky and Grant yelled and waved at the LINE, which they still saw in the vicinity of Light 58. The LINE did not respond to Grant and Kurowsky.

32. After several minutes, Chief Lees backed the LINE off the shoal. He continued his journey up the Arthur Kill.

33. The sun set at 5:09 p.m.

34. After its call to CGNY at 4:53 p.m., the LINE did not contact CGNY again until 5:20 p.m. The LINE then asked CGNY, "[W]ere you able to establish comms with the owner?" CGNY responded in the negative. The LINE then explained, "[W]e passed two men in a small boat, one of whom appeared to be the owner; we advised them where the vessel was. They appeared to be en route to its location." CGNY asked, "[A]re you saying that you passed two personnel in a small boat saying they're en route to the area, is that correct?" The LINE answered, "[W]e advised them the location of the vessel." CGNY responded by asking whether "we have any other information I can pass over?" The LINE answered in the negative.

35. At 5:40 p.m., Merz contacted CGNY again and spoke with Moochler. Merz explained that he was calling about the "sailboat that's been around the tanker channel all afternoon." Merz stated that he was not the owner but just "somebody that can

see the boat." He informed Moochler that "[t]he boat has broken loose and is now adrift in the bay, it's not, it, before it apparently it had dragged its ground, its ground tackle and anchored itself on the edge of the channel." Moochler responded, "Right." Merz then added, "Okay, and in the last half hour or so, it's parted from the mooring and is now presumably adrift in the bay somewhere." Merz concluded, "Just thought you'd like to know that." Moochler answered, "Okay, thanks a lot. I think they got a boat on the way to retrieve it, hopefully."

36. Kurowsky and Grant remained in the open-decked sailboat throughout the night, drifting across Raritan Bay in temperatures which were below freezing. The next morning, January 25, 1982, the sailboat fetched up on an ice floe off the shore of Keyport, New Jersey. Kurowsky's right foot had become frozen to the bilge. Grant walked over the ice floes to shore, where he alerted authorities to the location of the sailboat, and to Kurowsky's remaining on board in a disabled condition. A Coast Guard helicopter found the sailboat, hoisted Kurowsky aboard, and transported him to the Jersey Shore Medical Center.

37. Coast Guard policy on towing and salvage in effect on January 24, 1982, provided, in pertinent part:

In the promotion of maritime safety on and over the high seas and waters subject to the jurisdiction of the United States, the Coast Guard renders all practicable assistance to those who follow the sea whenever the Coast Guard can reasonably do so....

Although the Coast Guard will not compete or interfere with private towing activities or other commercial enterprise, it cannot rely upon private enterprise to render assistance in minor cases and itself act only when extreme jeopardy exists. Even though reliable information is received that a tug or other private assistance is proceeding to the scene, there is no assurance that it will complete the mission until it is on the scene and has the situation in hand. Until then Coast Guard units should proceed toward the scene.

If, upon arrival at the scene, private enterprise is already there and is rendering assistance, or is willing to render assistance, the Coast Guard shall not interfere with the private activity unless it becomes apparent that private enterprise cannot cope with the situation and that action by the Coast Guard is necessary to prevent loss of life or property. The private salvor's ability to carry out the operation is best determined by the Coast Guard On Scene Commander, but if doubt exists, the matter may be referred to the district commander. In all doubtful cases, however, the Coast Guard unit shall stand by and be prepared to render assistance until it is apparent that no further assistance is required.

When a Coast Guard unit is already rendering assistance and private assistance arrives on scene, the Coast Guard vessel shall turn the case over to the private operator if: (1) he desires to accept it; (2) the character of the assistance he can render is adequate; (3) the operator of the assisted vessel agrees; and (4) the shift of responsibility can be accomplished without further endangering the craft in trouble.... The length of time that a Coast Guard vessel is required to stand by while the commercial salvor and disabled vessel are negotiating will depend on the circumstances. Should a more urgent case arise, the Coast Guard vessel is free to depart and undertake the more urgent case. If no other cases are pending, the Coast Guard vessel should stand by until the negotiations are concluded, and the commercial salvor has taken the disabled vessel in tow.

Should a Coast Guard vessel arrive at the scene before a commercial salvage vessel, the Coast Guard vessel may take the vessel in tow pending arrival of the salvage vessel, if such action will contribute to the safety of the distressed vessel or reduce the time in which the Coast Guard vessel is required to stand by.

Coast Guard Addendum to National Search and Rescue Manual § 3.

**450**

## CONCLUSIONS OF ·LAW

38. This is a personal injury action subject to the Court's admiralty and maritime jurisdiction pursuant to the Public Vessels Act, 46 U.S.C. §§ 781–90, and the Suits in Admiralty Act, 46 U.S.C. §§ 741–52. *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *Kelly v. United States*, 531 F.2d 1144, 1148–49 (2d Cir.1976).

■ 39. There is no affirmative duty on the part of the Coast Guard to rescue or furnish assistance to a vessel or individual in distress. The decision to undertake a rescue is discretionary with the Coast Guard.· *Wellington Transportation Co. v. United States*, 481 F.2d 108, 110–11 (6th Cir.1973); *United States v. Gavagan*, 280 F.2d 319, 328 (5th Cir.1960), *cert. denied*, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961).

■ 40. The Good Samaritan doctrine applies to the Coast Guard. *See Patentas v. United States*, 687 F.2d 707, 714 (3d Cir.1982); *United States v. Devane*, 306 F.2d 182, 186 (5th Cir.1962); *United States v. Sandra & Dennis Fishing Corp.*, 372 F.2d 189, 197 (1st Cir.), *cert. denied*, 389 U.S. 836, 88 S.Ct. 52, 19 L.Ed.2d 98 (1967).

■ 41. Once the Coast Guard acts, and causes others justifiably to rely on such action, a duty arises to act reasonably and with due care. *Eklof Marine Corp. v. United States*, 762 F.2d 200, 203 (2d Cir. 1985).

■ 42. The Coast Guard's failure to exercise reasonable care creates liability if it is the proximate cause of the loss where the position of the injured party is worsened in reliance on the undertaking by the Coast Guard. *DeVane*, 306 F.2d at 186.

■ 43. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Patentas*, 687 F.2d at 715 (quoting Restatement (Second) of Torts § 324A (1965)).

44. After their communication with Lees, plaintiff and Grant reasonably relied on the Coast Guard. Such reliance was to the detriment of the plaintiff and Grant.

■ 45. Internal Coast Guard policy does not have the force of law and therefore does not create any affirmative duty of the Government toward private citizens. *Tringali Bros. v. United States*, 630 F.2d 1089, 1093 (5th Cir.1980).

■ 46. A failure of the Coast Guard to adhere to its internal guidelines is not conclusive, but may be considered along with all other evidence. *Id.* Thus, the failure of the crew of the LINE to ·follow internal Coast Guard procedures on towing and salvage may be viewed as some evidence of a failure to exercise reasonable care under the circumstances.

■ 47. It was unreasonable for Lees to encourage Grant and Kurowsky to continue their attempt to retrieve the sailboat after Lees and CGNY had concluded that it was unsafe for the LINE to make such an attempt and that Grant should wait until the following morning.

48. After having encouraged Grant and Kurowsky to continue, it was unreasonable for Lees and the LINE to depart the scene before observing that the MAKO had safely effected the tow of the sailboat and that no further Coast Guard assistance was required.

49. After receiving the LINE's report at 5:20 p.m. that it had advised two men in a small boat of the location of the sailboat and that they appeared to be en route to it, and after receiving Merz's call at 5:40 p.m. that the sailboat had broken loose and was probably adrift somewhere, it was unreasonable for CGNY to fail to direct the

LINE to return to the scene and evaluate the situation.

50. The Coast Guard's actions and failures to act increased the risk of harm to the plaintiff and Grant, worsened the condition of the plaintiff and Grant, and constituted negligence.

51. Lees had reason to anticipate that plaintiff would experience difficulty passing a line to Grant while Grant was boarding the sailboat. The Coast Guard's negligence was the proximate cause of plaintiff's casualty.

52. The defendant is liable to the plaintiff.

SO ORDERED.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW ON DAMAGES

This is an action for damages arising out of plaintiff's efforts to assist a third party in recovering a sailboat. A non-jury trial on liability began on November 3 and ended November 10, 1986. In Findings of Fact and Conclusions of Law dated November 12, 1986, the Court found defendant liable to plaintiff. A trial on damages was held on February 17 through 19, 1987. Having heard the oral evidence offered at the damages trial, and having considered the exhibits in evidence and briefs of counsel, this Court makes the following additional Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. During the course of his mishap, plaintiff became soaked with sea water from head to toe. *See* Transcript ("Tr.") at 5. He was immersed for about 15 to 20 minutes. Tr. at 6. During the night he did not sleep and his right foot, which was uncovered, became frozen to the bottom of the sailboat. Tr. at 11. Plaintiff lost sensation in his right foot and experienced a burning pain in his left foot and severe swelling of his hands. Tr. at 12–13, 20.

2. At the Jersey Shore Medical Center ("Jersey Shore"), where he had been transported by helicopter, plaintiff consented to amputation of parts of his right toes. Tr. at 16, 19–20. This procedure was not performed, however. Tr. at 20. Plaintiff did receive treatment for frostbite. Tr. at 18–19.

3. After being released from Jersey Shore, plaintiff received debridement treatment for about two months on his right leg and on toes of his left foot. Tr. at 23–24.

4. Following the accident and continuing to the present time, plaintiff has experienced a variety of physical complaints. These include: an increase in frequency of urination, tr. at 20–21; a burning sensation in his hands, primarily in damp weather, tr. at 21, 58; a decrease in temperature of his right foot, tr. at 32, 51; pain in his right foot, ankle and leg, tr. at 58; numbness in his right-hand index finger, tr. at 37; and difficulty in walking for long distances and in maintaining his balance, tr. at 30–33. Plaintiff also complains that his demeanor has been altered since the accident, specifically that he has become grouchy and no longer enjoys the company of family and friends. Tr. at 33–34.

5. As a result of these physical and emotional changes, plaintiff no longer participates in various family activities, refrains from dancing with his wife, has given up his hobby of assembling gun kits, and has lost a degree of proficiency in shooting pool. Tr. at 35–37.

6. Plaintiff's marriage has also suffered due to the changes in his attitude since the accident. Tr. at 75–76.

7. Plaintiff's medical expert testified that plaintiff's self-image has been impaired by his disability, and that this leads to anxiety and depressive symptoms. Tr. at 149.

8. Plaintiff's injuries were not caused by his consumption of alcohol. The Court accepts the testimony of plaintiff's medical expert, Dr. Lawrence I. Kaplan, that plaintiff's intact and equal ankle reflexes are a good indication that he does not suffer from an alcoholic neuropathy. Tr. at 153–54. In addition, plaintiff had no symptoms from his alcohol history prior to the accident, and the involvement of his lower ex-

tremities has been persistent and asymmetric in nature. Tr. at 195–96; Exh. 26 at 11. Defendant's medical expert, Dr. Marvin Ruderman, also stated that plaintiff's difficulties with his gait are not alcohol-induced. Tr. at 318, 338, 342.

9. Due to the accident, plaintiff suffered frostbite in his lower extremities with severe initial involvement and motor and sensory impairment. Plaintiff gradually recovered but now has residual effects and complaints which he never had before the cold exposure. Tr. at 196.

10. Dr. Kaplan noted minimal objective findings of a peripheral neuropathy that were left in terms of plaintiff's sensory impairment, coldness of his feet consistent with vascular involvement, and diminished vibration sense in the lower extremities. Tr. at 154–55. Dr. Ruderman also found nerve damage. Tr. at 314.

11. The Court accepts Dr. Kaplan's diagnosis that as a result of plaintiff's exposure to cold, he has a peripheral neuropathy secondary to the frostbite syndrome and that this is associated with causalgic symptoms, particularly involving the right lower extremity. Exh. 26 at 10–11; tr. at 196–97. Dr. Ruderman also found that plaintiff suffered a cold-induced injury, tr. at 318, and acknowledged that certain of plaintiff's present complaints are consistent with a frostbite injury, tr. at 341–42. Dr. Kaplan's diagnosis was that the causalgia, or persistent pain syndrome, and the peripheral neuropathy, or nerve damage, were confined to both lower extremities, but more on the right side. Tr. at 164, 196. Dr. Kaplan made no clinical findings with respect to a neuropathy in the right upper extremity. Tr. at 196.

12. The persistence of plaintiff's difficulties over a long period of time indicates that they are permanent in nature. Tr. at 159; Exh. 26 at 10.

13. Plaintiff was employed by Hess as a boat operator prior to his injuries and would have continued to work in that capacity if not for the accident. Tr. at 37. When he returned to Hess in August 1983, plaintiff was temporarily placed in the position of laborer, tr. at 37–38. After about a

month, he was assigned the job of dock watch, tr. at 40. In December 1985 plaintiff applied for and received a transfer to the position of guard, and he has continued to work in that capacity to the present. Tr. at 42.

14. Plaintiff bid off the dock watch job and into the guard job in order to get away from the water, where he experienced difficulty performing his duties due to the restricted use of his hands and right leg. Tr. at 44–45, 72–73.

15. As a result of his switch to the position of guard, plaintiff has suffered a diminution in earnings. Tr. at 43.

16. Prior to the accident, plaintiff was a moderate drinker who sometimes enjoyed beer with friends after work and also drank alcohol on other occasions. Tr. at 46, 85, 175. After the accident, plaintiff's drinking habits changed dramatically. Tr. at 46, 77. Plaintiff began to drink with greater frequency to relieve pain in his legs and hands. Tr. at 56. In May 1985, plaintiff briefly sought medical assistance for his drinking problem. Tr. at 47, 56. After speaking to a neighbor, however, plaintiff gave up drinking on his own and all at once. Tr. at 47–48.

17. Plaintiff is a white male, 48 years old, tr. at 74, has a high school equivalency degree, tr. at 207, and has a life expectancy of about 27 more years, until November 2013. Tr. at 274; Exh. K at 2.

18. Plaintiff has a work expectancy of about 13.7 more years, until age 61.5. Tr. at 127, 205, 274, 286, 292. The testimony of plaintiff's economist that plaintiff can be expected to work to at least age 65, tr. at 92, is unpersuasive in light of, among other factors, plaintiff's testimony that many of his co-workers have retired at age 55, tr. at 53.

19. In calculating plaintiff's future lost earnings from the date of trial, it is appropriate to rely, in addition, on the following facts: 1) that a boat operator's salary will increase, based on general inflation and other factors peculiar to Hess, at the rate of six percent annually, tr. at 208–209, 218, 246; 2) that a guard will continue to re-

ceive 86 cents per hour less than a boat operator, and that this difference will remain constant in the future, tr. at 128, 210, 231, 287; and 3) that due to the availability of overtime work, a boat operator earns 19.4% more than he would without such overtime, and that a guard does not have such overtime opportunities, tr. at 211, 288–89.

20. Moreover, the Court accepts the testimony of defendant's expert that a discount rate of 6.7% is appropriate. Tr. at 213, 248, 269–70. While plaintiff's expert testified that a 6% discount rate should be used, he also assumed an annual inflation rate of 3%, and thus calculated a net discount rate in real terms of 3%. Tr. at 95, 105, 107–08. Defendant's expert did not testify specifically on the appropriate net discount rate because he testified, and the Court accepts, that inflation and other factors will result in annual increases of a boat operator's salary of 6% and that a guard will continue to earn 86 cents less per hour than a boat operator.

21. Plaintiff's economist did not make deductions for state and federal taxes. Tr. at 109. Plaintiff has argued, however, that such deductions must be made. *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law with Respect to Damages, ¶ 82. The Court finds that defendant's economist properly accounted for plaintiff's tax liability, tr. at 212, 214–15, including the tax implications of interest income earned as a result of plaintiff's damage award, tr. at 215–16, 250–52, 273–74. The Court also accepts the testimony of defendant's economist that a 6.5% before tax reinvestment rate is appropriate.

22. Plaintiff's lost earnings from the date of his accident to the date of trial amount to $48,167. Tr. at 211–12. That amount is simply the arithmetic sum, adjusted for federal and state income tax liabilities, of the diminution in earnings due to plaintiff's shift out of the boat operator position. Tr. at 212.

23. Plaintiff's future lost earnings from the date of trial amount to $70,253. Tr. at 214. This sum was calculated, basically, by projecting a boat operator's earnings, taking out taxes, projecting a guard's earnings, taking out taxes, calculating the differences year by year, and reducing the result to present value. Tr. at 247, 267.

24. Plaintiff's loss of pension benefits, reduced to present value, amounts to $17,437. Tr. at 213–14. This loss results because pension benefits are calculated according to an employee's salary during his final three years, and a guard's pension is therefore substantially less than that of a boat operator. Tr. at 96, 112.

25. Plaintiff's total loss of earnings amounts to $135,857.

26. Plaintiff introduced no evidence regarding his medical expenses. *See* tr. at 198, 256–57, 352.

27. Plaintiff's damages for pain and suffering, discounted to present value, amount to $104,054.[1]

28. Plaintiff's total damages amount to $239,911.

29. Plaintiff's damages were the result of defendant's negligence.

## CONCLUSIONS OF LAW

30. "[A] tortfeasor should be required to put his victim in the same economic position that he would have occupied had he not been injured." *McCrann v. United States Lines, Inc.*, 803 F.2d 771, 773 (2d Cir.1986) (citation omitted).

31. The burden of proving damages is on the plaintiff. *Fleming v. American Export Isbrandtsen Lines, Inc.*, 451 F.2d 1329, 1333 (2d Cir.1971) (Moore, J., concurring in part and dissenting in part). "It is axiomatic that in order to obtain an award

---

**1.** Plaintiff's award for pain and suffering, before discounting to the date of his injury, is comprised of separate installments for the thirty-two year-long periods from the January 1982 accident through the duration of his life expectancy. The undiscounted amounts of these installments are as follows: period 1, $20,000; periods 2 and 3, $10,000 each; periods 4 and 5, $5000 each; periods 6 through 32, $3000 each. The Court used a net discount rate of 2%, and employed the mathematical equation provided by the Court of Appeals for the Second Circuit in *McCrann v. United States Lines, Inc.*, 803 F.2d 771, 773 n. 1 (2d Cir.1986).

of lost future wages plaintiff must present evidence to show that the diminution in his present and expected salary is a consequence of his injury." *Id.*

32. "When an injury renders a worker unfit to continue in his trade, the court must first calculate his projected salary for each year that he could have worked." *McCrann,* 803 F.2d at 773. In adjusting its projection to account for inflation, the court may "either subtract the estimated rate of inflation from the prevailing market rate of interest before discounting the judgment to present value or account for the effects of inflation in projecting the plaintiff's wages." *Id.* (citation omitted).

33. "Focusing upon after-tax earnings is an exercise in economic fairness," and this principle extends to all federal law claims for future lost wages. *Fanetti v. Hellenic Lines Ltd.,* 678 F.2d 424, 431 (2d Cir.1982), *cert. denied,* 463 U.S. 1206, 103 S.Ct. 3535, 77 L.Ed.2d 1387 (1983).

34. "[I]t is proper to discount awards for future pain and suffering to present value." *Metz v. United Technologies Corp.,* 754 F.2d 63, 67 (2d Cir.1985). *See also Chiarello v. Domenico Bus Service,* 542 F.2d 883, 886–87. (2d Cir.1976) ("Irrespective of the type of injury involved, the advantage of the present use of money is the same....").

35. The preferred approach for calculating the present value of damages involves discounting the entire award back to the date of injury and awarding prejudgment interest, if any, on that amount. *Taliercio v. Compania Empressa Lineas Argentina,* 761 F.2d 126, 129 (2d Cir.1985) (citing *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 538 n. 22, 103 S.Ct. 2541, 2551 n. 22, 76 L.Ed.2d 768 (1983)).[2]

36. In a suit under the Public Vessels Act ("PVA"), 46 U.S.C. §§ 781–90, which incorporates the Suits in Admiralty Act ("SIAA"), 46 U.S.C. §§ 741–52, "no interest shall be allowed on any claim up to the time of" the formal entry of judgment. *See* § 782; *Gretchen v. United States,* 618 F.2d 177, 178 & n. 2 (2d Cir.1980); *Lauro v. United States,* 168 F.2d 714, 715 (2d Cir. 1948). Accordingly, prejudgment interest may not be awarded in this case. *See Parks v. United States,* 784 F.2d 20, 28–29 (1st Cir.1986) (PVA's prohibition against prejudgment interest prevails in suit within scope of both PVA and SIAA); *Blanco v. United States,* 775 F.2d 53, 57 n. 4, 63 n. 8 (2d Cir.1985) (claims within scope of PVA remain subject to its terms despite applicability of SIAA) (citation omitted).

SO ORDERED.

---

2. The Court has calculated damages for pain and suffering in accord with *Taliercio.* With respect to loss of earnings, however, both plaintiff's and defendant's economists used the date of trial rather than the date of injury as the basis for their present value calculations. In reaching its findings, the Court has largely accepted the opinion of defendant's economist. At this juncture, the Court has determined that the impracticability of adjusting its findings to revolve around the date of injury outweighs the slight imprecision generated by the parties' approaches. The Court, however, is willing to entertain additional submissions from the parties limited to this issue only. Any such submissions, in the form of affidavits or otherwise, must be received within 30 days from the date hereof.